UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STEPHANIE SMALLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:16-cv-00363-TWP-MPB |
| | ) |
| ROCHE DIAGNOSTICS OPERATIONS, INC., | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendant Roche Diagnostics Operations, Inc. ("Roche") (Filing No. 57). Plaintiff Stephanie Smalley ("Smalley") filed this action against Roche asserting violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), when she was terminated from her employment on the basis of race. Roche denies that Smalley was discriminated against because of her race and contends that she was terminated for poor performance. For the reasons set forth below, Roche's Motion for Summary Judgment is **granted in part and denied in part**.

## I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, are presented in the light most favorable to Smalley as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Roche is a distributor for *in vitro* diagnostic devices and supplies with their principal offices located in Indianapolis, Indiana. (Filing No. 58 at 8.) Roche maintains an Equal Employment Opportunity and Affirmative Action policy which explains that it will not engage in

any personnel decisions or activities which discriminate and Roche employees are trained on the EEO policy. *Id.* In addition, Roche maintains a Corrective Action Policy governing employee discipline where managers have discretion under the policy to decide the level of corrective action the employee receives. ([Filing No. 58 at 9](#).)

Smalley is an African-American woman who began working for Roche as a Payroll Accountant in October 2014. ([Filing No. 65-1 at ¶2](#).) The Payroll Department consists of two separate payroll sub-compartments: the Production Department and the Tax and Accounting Department. ([Filing No. 58 at 9](#).) The two departments are responsible for producing and ultimately completing Roche's payroll for thousands of employees across the country. *Id.* The Tax and Accounting employees are responsible for timely submitting payment files to banks, and instructing the bank to process the payment so that Roche employees are paid their wages. *Id.*

Jesse Lange ("Lange") previously held the Payroll Accountant position until August 2014 when Lange was transferred to another position within the company. Betty Holt ("Holt") covered the position from August 2014 until Smalley was hired in October 2014. ([Filing No. 58 at 11](#).) Holt was trained by Lange for six months during which time Lange walked Holt through payroll processes from start to finish including an off-cycle bonus run concurrently with Holt. ([Filing No. 65-8 at 4-5](#).) Smalley alleges that she did not receive adequate training for her position. She received training from Holt for approximately one month during which she watched Holt complete processes and took notes, without actually completing any tasks herself. ([Filing No. 64 at 3](#).) Although Smalley admits to contacting Lange occasionally because he was the "go-to guy in the department," Smalley was told, by her supervisor, not to contact Lange to train her on procedures and processes as she was to receive her training from Holt. ([Filing No. 64 at 18](#), 33; [Filing No. 65-1 at 2](#).) Susan McCluskey ("McCluskey"), a Payroll Specialist and later a Payroll Account/Tax

Specialist began working for Roche is 2012 and remained at Roche until January 2015. McCluskey trained with Lange for the Payroll Tax Specialist position for almost a year; she also shadowed Holt. (Filing No. 65-7 at 3.) McCluskey's desk was next to Holt's desk during her tenure at Roche, and she observed Holt making numerous mistakes over those years. (Filing No. 65-6 at 2.) When Smalley began her employment at Roche, she was allowed to shadow McCluskey for a month.

Roche has four primary types of payroll: biweekly; monthly semimonthly; and, off-cycles payroll such as bonus pay. Roche also has an affiliate in Puerto Rico, and that affiliate's employees are on the biweekly payroll schedule. The Puerto Rico payroll covered approximately 220 employees and was due every other Friday without exception. Smalley was responsible for processing and balancing payroll for virtually the entire company which included processing employee paychecks and annual company bonuses—an off cycle payroll—which were due on March 15th each year. The exception was that Holt was responsible for payroll for the "DIA" business unit—a smaller, affiliated business segment within Roche. Smalley had never been trained to do a bonus run. (Filing No. 65-1 at 4.) Roche notes however, that Smalley had successfully completed other off-cycle runs prior to March 2015.

On December 15, 2014, Lange sent Smalley an email stating that she had done a good job getting caught up on a back log of entries. (Filing No. 65-1 at 7.)

Wendy Heathcote ("Heathcote") became Smalley's supervisor in December 2014, and remained her supervisor until Smalley's termination. (Filing No. 65-11 at 18.) Due to her short tenure at Roche, Smalley had only one annual performance review in December 2014 that covered her first two months of employment. The areas of concern included the following:

> It has been noticed there is an overall lack of urgency when completing the payroll processing and other job responsibilities. The Payroll Accounting position is a high

3

> impact, high visibility role with much responsibility to close out the payroll and post the bank files timely and accurately. Stephanie seems to be struggling with completing these tasks accurately as well as not accepting her role when things do not balance or are incomplete. It has been noticed on payroll days that when payroll closes late, Stephanie has packed up and left for the day with no discussion with the payroll processing team prior to leaving. It is urgent that she remain in lock-step with the processing team to ensure files are posted no matter how late the payroll closes. By not communicating with the team, they have no way of knowing if she is going to provide coverage. Additionally, there is evidence that Stephanie does not understand the systems and processes she is in charge of. Mistakes are made, and questions are consistently being asked that indicate a lack of in-depth critical thinking related to the processes she performs.

(Filing No. 65-11 at 25.) Positive feedback included Smalley's willingness to collaborate and her likeability among her peers and department/SSC management teams. *Id.* Heathcote stated "I have no doubt as she continues to grow within her role, she will continue to build the relationships necessary to be successful." *Id.* Smalley received a salary increase after being with Roche for 4 ½ months and it was noted that she was fully meeting expectations. (Filing No. 65-10 at 10.)

As noted previously, Holt was responsible for processing the DIA business unit payroll and Smalley was responsible for processing the regular payroll and bonus runs. Regular payroll had to be completed before bonus runs. The files were required to be sent together, otherwise the two files would merge and the bank would be unable to identify and properly process them for payment. In March 2015, Roche alleges that Smalley sent her completed portion of the regular payroll without waiting for Holt's DIA payrolls because Smalley could not find Holt. (Filing No. 58 at 9.) Roche alleges Smalley's failure to include Holt's portion of the payroll set in motion a chain of events that led to multiple errors in processing the bonus run (including duplicate payments) and ultimately the team had to stay late into the evening on March 11, 2015 to complete the initial bonus run by the close of business.

Heathcote discovered the duplicated payments issue on March 12, 2015, which required the team to spend a second night working many hours to correct the error in order to prevent

significant losses to the company. (Filing No. 58 at 18.) Heathcote, along with other members of management, determined that Smalley was solely responsible for the mistakes that occurred throughout the process. Upper-management personnel Tom Adkins ("Adkins") and Cindy Brandt ("Brandt") wanted to terminate Smalley at that time for the critical errors, but Heathcote persuaded them to give her another chance. Instead, on March 25, 2015, Smalley received a written disciplinary notice and a sixty day improvement plan for the bonus run incident that warned Roche reserved the right to terminate the Documented Counseling and take further disciplinary action, up to and including termination, consistent with performance up to that date. (Filing No. 65-11 at 35.)

On March 30, 2015, Smalley attached a rebuttal to the Documented Counseling with her concerns that she has told management several times that she had not been provided with adequate training. (Filing No. 65-11 at 39.) With regards to the bonus run incident she admitted to making some mistakes during the bonus cycle, but disputed that she was the cause of the duplicated payments issue discovered on March 12, 2015. Smalley believed the bonus run was processed incorrectly from the beginning due to the faulty advice she received from both Production Supervisor Lori Wright ("Wright") to enter "employee numbers" and IT contractor Phil Coriveau to enter "p-numbers" over and over again—which resulted in double payments—when she should have been entering "payroll areas". Smalley recalls that Heathcote told her "I think you are getting a raw deal and you are being thrown under the bus." (Filing No. 65-1 at 5.)

After the bonus incident, Smalley received two emails with positive feedback. On March 26, 2015, Production Team Lead Shaun Dauenhauer, sent Smalley an email stating,

> HUGE WIN!!! WOOHOO for Stephanie!! She rocked this SM payroll!! Did an awesome job trouble shooting PHARMA issues last night, and then got the "P" numbers to us first thing this morning. This is awesome, especially after the crazy week of processing we have had. Thank you Stephanie for sticking with it!

([Filing No. 65-11 at 19](#)). In mid-May 2015, Smalley received a hand-written note from Heathcote stating, "Stephanie, Thank you for your drive & dedication. You've been working so hard & I notice! I'm proud of you. Keep up the good work. Please use this card to treat yourself over at Building "K." Leave an hour early one day and enjoy! Love, Wendy." *Id.* at 22.

Smalley was responsible for payroll of Roche's affiliate in Puerto Rico. She was required to process the Puerto Rico payroll by Wednesday of the payday week and notify Roche employees located in Puerto Rico of the completion, so that the payroll could be timely released to the Puerto Rican banks. The payroll had to be processed by Wednesday in order for employees to be paid on time by Friday of the pay week. ([Filing No. 58 at 12](#).) Puerto Rican banks required two days to process bank files, therefore, failure to process the payroll by Wednesday could potentially result in late payments of wages owed to employees and legal penalties. *Id*.

While the Documented Counseling was still in effect, Smalley failed to timely complete the Puerto Rico payroll during the week of May 18, 2015.[1] In addition to processing Puerto Rico's payroll by Wednesday during payroll weeks, Smalley was required to send an email to the local Puerto Rico Roche employees that payroll was processed and ready to be released to Puerto Rican banks. She was also required to copy Heathcote and Wright on the email. Smalley prepared the payroll a day late, on Thursday, and failed to copy Heathcote and Wright as she had done in the past. As a result, Puerto Rico's Human Resources employee, Mayra Lopez, received numerous telephone calls and complaints from Roche's employees in Puerto Rico who did not receive their paychecks on time. Based on these calls, Heathcote discovered that Smalley failed to submit the payroll on time. Smalley's response was that "it was a busy week and she apparently thought Thursday was Wednesday," and that she did not think it was a big deal to not copy Heathcote and

---

[1] Although Smalley does not concede responsibility for the bonus run incident, she concedes to this mistake.

6

Wright on the confirmation email that went to Puerto Rico. ([Filing No. 58 at 22-23](#).) After this error, Smalley was terminated on June 1, 2015. Roche contends Smalley was terminated because Heathcote believed Smalley was trying to conceal the untimely submission of payroll to Puerto Rico and Smalley was on Documented Counseling at the time of the error. Heathcote, Brandt, and Adkins made the decision to terminate Smalley. ([Filing No. 58 at 23-24](#).)

## II. LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Indeed, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v.*

*Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth*, 476 F.3d at 490. Instead, when ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id*.

### III. DISCUSSION

Smalley filed this action alleging she was terminated from Roche because of her race and that a similarly situated Caucasian employee, Betty Holt, engaged in conduct of comparable seriousness, but was not terminated. Roche denies that Smalley was discriminated against on the basis of her race and contends that there are no material issues of fact, therefore, summary judgment is warranted. Before turning to the substantive issue, the Court will first address Roche's assertion that it should disregard Paragraph 31 of Smalley's second affidavit.

#### A. Paragraph 31

Roche argues that in an effort to avoid summary judgment, Smalley has created a factual issue in Paragraph 31 of her second affidavit, which contradicts her deposition testimony. ([Filing No. 66 at 1](#).) Roche asks the Court to disregard the portions of Smalley's second affidavit which contradict her deposition testimony. *Id*. In her Response brief, Smalley argues that the first time an allegation was made that she attempted to cover-up her late payment of the Puerto Rico payroll was in Heathcote's deposition in June 2017, and thus, Roche has provided shifting reasons for her termination. ([Filing No. 64 at 31](#).) Roche contends that Smalley improperly relies on Paragraph 31 of her own affidavit in support of her assertion that it provided shifting reasons for her termination. ([Filing No. 66 at 2](#).) Paragraph 31 states the following:

> I met with Wendy Heathcote and Amanda Decker on June 1, 2015, and I was told I was being terminated for the bonus run incident and the late payment to Puerto Rico employees in May 2015. After I said is that the only reason then Amanda

8

Decker stated "you do have the documented counseling regarding the bonus run in your file".

([Filing No. 65-3 at 3](#)). At her deposition, Roche's counsel questioned Smalley about what was said to her at her termination meeting:

Q: But no reason to dispute that the company could have thought, based on this, that you were trying to conceal it from them.

A: Yeah, I could definitely see them thinking that, because Wendy mentioned that when she called me in the office with Amanda Decker and terminated me. And I didn't like the way she said it, because I'm as honest as they come. I'm not a liar. I despise that. And Wendy made the comment, she said, "You deceived me." You know, that's a strong word. And I was like, "How did I deceive you?" Deceive is lying. That's flat out lying, not sending an email—copying her on an email. I would rather for her to say, "You didn't copy me on an email" instead of saying, "You deceived me," you know. So yeah, I could—so that's how I know she thought that.

([Filing No. 59-2 at 5-6](#)). Roche argues that Smalley is implying that Heathcote and Decker did **not** reference her attempted cover-up of the Puerto Rico error during the termination meeting. Yet in her deposition testimony, Smalley admitted that Heathcote and Decker informed her **during her termination meeting** that they considered her concealment of the Puerto Rico incident when making the discharge decision.

The relevant question is not *what Smalley believed Roche thought* about her not copying Heathcote on the email—*i.e.,* her alleged concealment—but *what reasons were actually told* to Smalley during the termination meeting for her discharge. In her deposition, Smalley explains that she was told that the active Documented Counseling, bonus run incident, and Puerto Rico payroll error were the reasons for her termination, which is consistent with her sworn declaration. ([Filing No. 67 at 3](#).) When discussing the Puerto Rico payroll email at the termination meeting, Smalley testified in her deposition that she was told that she forgot to send the email, not that Roche believed she intentionally concealed the email from her managers. Specifically, Smalley testified:

9

> Q. So the bonus run incident and the Puerto Rico incident were referenced in the termination meeting; one by Amanda Decker, one by Wendy Heathcote?
> A. Well, it wasn't referenced as first.
> Q. Right.
> A. Because the reason they gave me for the termination was that I forgot to send the email…. So the reason I was terminated is because I did not send the email to the Puerto Rico employees.

(Filing No. 65-4 at 19). The Court finds no inconsistency between Smalley's affidavit and deposition, and declines to strike Paragraph 31 of Smalley's second affidavit.

**B.**     **Racial Discrimination**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Roche asserts that Smalley cannot establish race discrimination using the framework explained in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) (Filing No. 58 at 28).  The *McDonnell Douglas* doctrine is an indirect method framework and consists of three basic steps: (1) a plaintiff must establish a *prima facie* case of discrimination based on race; (2) if she does so, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse action; and (3) the plaintiff must then show the stated reason is pretextual.  *See Stewart v. Henderson,* 207 F.3d 374, 376 (7th Cir. 2000).  A plaintiff establishes a *prima facie* case by establishing evidence that would allow a reasonable jury to find on each claim that:  (1) he is a member of a protected class; (2) he was meeting the employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated non-protected class member.  *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005).  If the plaintiff satisfies that burden, then the employer must articulate a legitimate, non-discriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit

10

evidence that the employer's explanation is pretextual. *Andrews v. CBOCS West, Inc.,* 743 F.3d 230,234 (7th Cir. 2014). "When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner. . .the second and fourth prongs of *McDonnell Douglas* merge—allowing the plaintiff to establish a prima facie case, stave off summary judgment for the time being, and proceed to the pretext inquiry." *Peele v. Country Mut. Ins. Co.,* 288 F.3d 319, 329 (7th Cir. 2002).

Regardless of whether a plaintiff uses the direct method, indirect method, or both methods, "the legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Id.* "Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id.* The sole question that matters is whether a reasonable juror could conclude that the plaintiff would have kept his job if he was a different race or did not engage in protected activity and everything else had remained the same. *See Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F. 3d 734, 736–37 (7th Cir. 1994).

It is undisputed that Smalley is a member of a protected class, and that she suffered an adverse employment action when she was terminated. However, Roche disputes that Smalley was meeting legitimate performance expectations, and asserts that she cannot show a similarly-situated comparator was treated more favorably. Roche also contends that it had a legitimate, non-

discriminatory reason for the termination. Smalley summarizes her case as "classic discrimination whereby an African-American employee is expected to do flawless work with less training." ([Filing No. 64 at 33](#).) She argues that Roche has applied its legitimate expectation or policies in a discriminatory fashion, and thus the Court should merge the second and fourth prongs of the *prima facie* test and its analysis should go directly to pretext. ([Filing No. 64 at 28](#)).

The Court will begin its discussion with Roche's contention that Smalley was meeting Roche's legitimate business expectations because of two significant performance errors, for which she was disciplined, including their belief that Smalley attempted to conceal one of those errors. Because of the timing of the favorable feedback, at a minimum, Smalley has raised a factual dispute as to whether she was meeting Roche's legitimate business expectations at the time she was terminated. Smalley received a salary increase with documentation that stated she was "fully meeting expectations" approximately four months before she was terminated. In mid-May 2015, a few weeks before her termination, Smalley received a note and reward from her supervisor, Heathcote, acknowledging her good work. Considering the favorable feedback and incentives Smalley received close in time to her termination, the Court agrees with Smalley that it must assume that she has met the "legitimate expectations" element of the *prima facie* test where that element dovetails with the issue of pretext. *Curry v. Menard*, 270 F.3d 473, 478 (7th Cir. 2001).

The heart of this dispute concerns the treatment of Smalley's comparator, Holt. Smalley alleges that Holt, a Caucasian Payroll Account Specialist, made numerous mistakes and she was not disciplined or terminated. She alleges that Holt made similar mistakes regarding late submission of the Puerto Rico payroll twice in 2014 and numerous mistakes thereafter, but Holt was not terminated. Holt also made a late payroll submission to Puerto Rico in May 2015.

"[T]he similarly-situated inquiry is flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Coleman v. Donahoe,* 667 F.3d 835, 841 (7th Cir. 2012) (citation omitted). "There must be 'sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination.'" *Id.* (citation omitted). "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *Filar v. Board of Educ. of City of Chicago,* 526 F.3d 1054, 1061 (7th Cir.2008). "In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman v. Donahoe,* 667 F.3d 835, 847 (7th Cir. 2012) (citations omitted). "This is not a 'magic formula,' however, and the similarly-situated inquiry should not devolve into a mechanical, 'one-to-one mapping between employees.'" *Id.*

Roche does not dispute that Holt is similarly situated; the two employees held the same position, and had the same supervisor—Heathcote. It is undisputed that Holt, at a minimum, made one significant error. ([Filing No. 66 at 6](#).)

> Defendant admits that on one occasion in July of 2015, Ms. Holt did make a mistake with the Puerto Rico payroll that Ms. Holt **immediately** disclosed to Ms. Heathcote, enabling Defendant to correct the issue (distinct from how Plaintiff tried to conceal her error). This is the **only** significant performance error committed by Ms. Holt of which the decisionmakers were ever aware.

*Id.* (emphasis in original). Smalley contends that Holt made numerous mistakes and it is disputed whether the decisionmaker—Heathcote—was aware of the mistakes. ([Filing No. 64 at 11](#).)

Similar to the dovetailing of the "legitimate expectations" element with the pretext analysis, the same happens where the plaintiff argues that an employer's discipline was applied in an uneven manner. *Coleman,* 667 F.3d at 858. ("Evidence that the employer selectively enforced a company policy against one gender but not the other would go to both the fourth prong of the prima facie case and the pretext analysis. Thus, the same inquiry into similarly situated employees has been made at the pretext stage.") (Quotation marks and citation omitted.)

In support of her argument that Holt was not disciplined for making similar mistakes, Smalley offers McCluskey's testimony that "a routine part of payroll was fixing Betty Holt's mistakes." (Filing No. 65-6 at 3.) McCluskey testified that Heathcote was aware of Holt's mistakes, due to the fact that Heathcote and other employees, including McCluskey, had to stay and work overtime to fix Holt's mistakes. *Id.* Additionally, McCluskey testified that Roche Manager Heatherly Noble ("Noble") met with McCluskey and Holt after two occasions (summer 2014 and December 2014) when Puerto Rico employees did not receive their checks on time.[2] *Id.* at 3-4. Smalley alleges that she personally spent time fixing Holt's mistakes on an occasion when garnishments were not received. *Id.* On one of the occasions that Smalley fixed a garnishment issue and authorized the check, Smalley alleges that Heathcote asked Smalley why Holt did not process the check.

Similar to Smalley's Puerto Rico incident, Holt's Puerto Rico incident involved double payments to Puerto Rico employees. Holt's mistake caused an overpayment of approximately $640,000.00 and caused the team to spend numerous hours correcting the mistake but Holt was not disciplined. (Filing No. 65-10 at 6.) Roche responds that Holt was not disciplined for this incident, despite its awareness, because she immediately and voluntarily disclosed her mistake to

---

[2] McCluskey alleges that, at the time of this meeting, Holt was responsible for processing Puerto Rico payroll. (Filing No. 64 at 12.)

14

management. (Filing No. 66 at 11.) On July 3, 2015, Heathcote sent an email to Adkins and Brandt, after Holt's error, that she (Heathcote) was "100% committed to improving the reputation of [the] department and quality of [the] department's work." (Filing No. 65-11 at 51.)

Roche relies on *Khan v. Eli Lilly and Company*, 2008 WL 833203 (S.D. Ind. March 27, 2008), where then district court judge David Hamilton, granted summary judgment to the employer and dismissed discrimination claims where there was no admissible evidence indicating that the proffered reasons for the employment actions were factually baseless or insufficient to motivate the employers' decision. Unlike in *Khan*, Smalley's allegations regarding Holt's similar mistakes are supported by more than mere speculation. A witness may only testify to personal knowledge. *Id*. at *19. "Although personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation of other first-hand personal experience.'" *Id*.

Here, Smalley testified that she personally fixed some of Holt's garnishment errors and was thanked by management for doing so. (Filing No. 64 at 13.) In addition, McCluskey testified to personally putting in overtime to "fix Holt's mistakes," and that Heathcote the department supervisor beginning December 2014, was present to observe when Holt continued to make the same mistakes she had always made. (Filing No. 64 at 12.) On one of the times when the team had to stay and work overtime for one of Holt's mistakes, McCluskey testified to being in a meeting with Noble and Holt regarding the error. Finally, although Roche offers mitigating circumstances for Holt's July 2015 Puerto Rico incident, it nevertheless admits that it happened. "Where a proposed comparator violated the same rule as the plaintiff in an equivalent or more serious manner, courts should not demand strict factual parallels." *Coleman,* 667 F.3d at 851.

Although some of Smalley's supporting deposition testimonies may involve reasonable inferences, those reasonable inferences are admissible to the extent that they are "grounded in

15

observation of other first-hand personal experience." *Id*. This includes the evidence that Smalley has presented regarding any possible awareness that management may or may not have had regarding Holt's mistakes. With regards to the fact that at some point there may have been different supervisors/managers during the times at issue, the relevant question when examining comparators is the relative treatment by the same decisionmaker. *Coleman,* 667 F.3d at 848. It is undisputed that Heathcote was the decisionmaker for the payroll department on both occasions when Smalley was disciplined, and Heathcote was the decisionmaker on the occasion when Holt was not disciplined.

The Court determines that the pretext analysis and the legitimate expectations analysis merge, due to the relative timing of the favorable feedback that Smalley received from Heathcote as well as the salary increase which documented that Smalley was "fully meeting expectations". Additionally, the similarly-situated element merges with pretext where the plaintiff alleges someone outside of her class was given more favorable treatment in the disciplinary context. "Such evidence of selective enforcement of a rule 'calls into question the veracity of the employer's explanation.'" *Coleman* at 857.

Next, Smalley contends the evidence shows pretext because Roche has given shifting or inconsistent reasons for her termination. ([Filing No. 64 at 30-31](#).) Smalley's termination letter specifically mentions the March 25, 2015 and May 22, 2015 incidents as the reasons for Smalley's termination. ([Filing No. 65-11 at 42](#).) This is consistent with what Smalley was told her during her termination meeting. The May 22, 2015 reason notes the lack of timeliness and accuracy, but does not mention the additional fact of concealment. As noted earlier, Smalley argues that she was not made aware of the concealment reason for her termination until it came up in Heathcote's June 2017 deposition. ([Filing No. 64 at 31](#).) Roche has stated that the concealment issue was the

critical difference that caused management to view Smalley's and Holt's significant errors wholly distinct. (Filing No. 66 at 11.) The Court is not persuaded by Roche's argument that Smalley's affidavit regarding the reasons given to her for her discharge conflict with her deposition testimony and should therefore be disregarded. Regarding pretext, there exist a material factual dispute.

Viewing the facts in a light favorable to Smalley, she has presented evidence sufficient for a reasonable jury to infer that a similarly-situated employee outside of her protected class received more lenient punishment for an equivalent performance error. Together with the evidence that she received favorable feedback and incentives close in time to her termination, and her allegation that Roche has provided shifting reasons for her termination, a genuine issue of fact exists as to whether Roche's asserted reasons for terminating Smalley were pretextual. Roche's argument that Heathcote's saving of Smalley's job when she had a clear opportunity to discharge her after her first significant error, triggering a presumption of non-discrimination, is unavailing for two reasons. First, the case that Roche cites to make this point involved a presumption of non-discrimination where a period of two years passed between the decisionmaker's retaining of an employee after a merger and the adverse termination. *Chiaramonte v. Fashion Bed Grp., Inc., a Div. of Leggett & Platt, Inc.,* 129 F.3d 391, 399 (7th Cir. 1997). However, Smalley was terminated approximately *two months* after Heathcote allegedly saved her job. Second, Smalley was not completely out of the woods when her job was spared. Heathcote placed Smalley on formal Documented Counseling, attributing Smalley sole responsibility and discipline for the bonus run error, whereas Smalley alleges it was a team effort to complete the bonus run and enter the information that resulted in duplicated payments. (Filing No. 65-11 at 39.) Smalley was placed on sixty day strict performance compliance with stated objectives. Failure to meet those objectives during this time period were grounds for immediate termination. Because Smalley has cast

sufficient doubt on Roche's explanation of its decision to terminate her that would permit a reasonable jury to infer intentional discrimination, summary judgment is **denied**.

C.      **Punitive Damages**

Roche also moves for summary judgment on Smalley's claim for punitive damages. Title VII provides for punitive damages in employment discrimination cases, however, the prevailing party is not automatically entitled to such damages. To recover punitive damages Smalley must show that Roche engaged in intentional discrimination and has done so with malice or reckless indifference to her federally protected rights. *See Bruso v. United Airlines, Inc*., 239 F.3d 848, 857 (7th Cir. 2001) (citation omitted). "The terms 'malice' and 'reckless indifference' refer to the employer's knowledge that it may be violating federal law, not its awareness that it is engaging in discrimination." *Cooke v. Stefani Mgmt. Servs., Inc.,* 250 F.3d 564, 568 (7th Cir. 2001).

> A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws. A plaintiff may also establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions.

*Bruso at* 858. The designated evidence must demonstrate that the defendant has engaged in some "egregious" misconduct. *See Kolstad v. ADA*, 527 U.S. 526, 534 (1999). In other words, Roche must have been "motivated by evil motive or intent, or . . . involve[d] reckless or callous indifference to the federally protected rights of others." *Id*. at 536. Carelessness or negligence is not enough. *See Emmel v. Coca-Cola Bottling Co*., 95 F.3d 627, 636 (7th Cir. 1996). This is a higher hurdle than merely proving the underlying unlawful discrimination. *Id*. Punitive damages are warranted only in a very limited subset of cases involving intentional discrimination. *Id.*

Smalley alleges that Heathcote lied to cover up her discriminatory conduct when she testified that Holt made only one mistake. (Filing No. 64 at 35.) Smalley contends that this alleged

18

lie, along with Heathcote's knowledge of the laws against racial discrimination, show that Roche acted with reckless indifference to Smalley's federally protected rights. *Id.* The Court is not persuaded because Heathcote's alleged discriminatory conduct is not enough.

*Emmel* is a type of case where punitive damages were warranted. *Emmel* is not a simple indirect evidence or statistical case of discrimination by the employer. In *Emmel*, evidence introduced by plaintiff included a number of statements by the owner, the president, the vice president, and the vice president for the northern zone, which indicated a clear corporate resistance to women holding positions in upper management. *Id* at 637. Here, Smalley suffered no race based verbal abuse or comments whatsoever in the workplace that support race discrimination. Smalley does not dispute that she made errors and was responsible for processing the Puerto Rico payroll late and that she was under a Documented Counseling plan which set forth a sixty day action plan for improvement at the time when she issued the late payroll—and it remains disputed whether Heathcote lied when she testified that Holt made only one mistake. In addition, although questions of material fact exist as to whether Smalley was treated less favorably by Heathcote than a similarly situated comparator, there is no evidence that Roche as a company had a policy of discrimination against African-Americans. In fact, Roche had implemented a written Equal Employment Opportunity and Affirmative Action policy which prohibits its employees from engaging in discriminatory or retaliatory conduct. ([Filing No. 59-3 at 21](#).) The designated evidence demonstrates that Roche did not act with malice, fraud, gross negligence, or oppressiveness in terminating Smalley; therefore, Roche's motion for summary judgment on Smalley's claim for punitive damages is **granted**.

## IV. CONCLUSION

When ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. For the reasons stated above, Roche's Motion for Summary Judgment (Filing No. 57) is **GRANTED in part and DENIED in part**. Summary judgment is **granted** regarding Smalley's claim for punitive damages and this claim is **dismissed**. The Court finds that there are material disputes of fact as to whether Smalley was terminated because of her race, and whether the proffered reasons for her termination were pretext for discrimination, therefore, summary judgment is **denied** and this claim remains pending for trial.

**SO ORDERED.**

Date: 3/14/2018

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@stowersandweddle.com

Amber K. Boyd
AMBER BOYD, ATTORNEY AT LAW
amber@amberboydlaw.com

David J. Pryzbylski
BARNES & THORNBURG LLP (Indianapolis)
dpryzbylski@btlaw.com

Jaclyn Susan Gessner
BARNES & THORNBURG LLP
jgessner@btlaw.com

Kenneth J. Yerkes
BARNES & THORNBURG LLP (Indianapolis)
ken.yerkes@btlaw.com